# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
information associated with the Google LLC account number 348579712231 and email address lunascleaning57@gmail.com, that is stored at premises controlled by Google LLC

Case No. 26-981M(NJ)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ______________ District of ______________ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before August 12, 2026 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Nancy Joseph, U.S. Magistrate Judge.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ______________.

Date and time issued: 7/29/2026 @ 4:27 p.m.

*Judge's signature*

City and state: Milwaukee, Wisconsin

Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Google LLC account number 348579712231 and email address lunascleaning57@gmail.com ("TARGET ACCOUNT"), that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

**I. Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google. Google is required to disclose to the government for each account or identifier listed in Attachment A the following information from October 1, 2024 to January 30, 2026, unless otherwise indicated:

a. All business records and subscriber information, in any form kept, pertaining to the Account, including:

1. Names (including subscriber names, user names, and screen names);

2. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses, including alternate and recovery email addresses);

3. Telephone numbers, including SMS recovery and alternate sign-in numbers;

4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including log-in IP addresses;

5. Telephone or instrument numbers or other subscriber numbers or identities, including any temporarily assigned network address, SMS recovery numbers, Google Voice numbers, and alternate sign-in numbers

6. Length of service (including start date and creation IP) and types of service utilized;

7. Means and source of payment (including any credit card or bank account number); and

8. Change history.

9. All device information associated with the Account, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC) addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, and telephone numbers;

10. Passwords or other protective devices in place and associated with the Accounts, which would permit access to the content stored therein;

11. The types of applications and services utilized by the Account(s);

12. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Google;

13. For the period from October 1, 2024 to January 30, 2026, all contacts stored by the Account(s), including address books, phone numbers, e-mails, social network links, calendar data, and images;

14. For the period of October 1, 2024 to January 30, 2026, all location data whether derived from Global Positioning System (GPS) data, cell site/cell tower triangulation/trilateration, precision measurement information such

as timing advance or per call measurement data, Wi-Fi locations, IP addresses, search history, advertising data, or metadata of images and videos, including all data associated with the use of Location Services and Location History, and all Google Maps data (including data concerning All maps data associated with the account, including Google Maps and Google Trips, including: all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; My Maps data; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history), and SSIDs and MAC addresses for all WiFi access points that have been detected by or connected to devices associated with the account. Such data shall include the GPS coordinates and the dates and times of all location recordings;

15. For the time period of October 1, 2024 to January 30, 2026, all records concerning the deletion of location data associated with the Account (except for data deleted by Google in the normal course of business);

16. For the time period of October 1, 2024 to January 30, 2026, Google Map location saved and/or frequent locations, favorite and/or starred locations including, but not limited to, searches conducted using the Google Map and/or Maze services, locations and other data associated with the use of My Maps and Location Sharing, and the logs and metadata associated with all of the above;

17. For the period of October 1, 2024 to January 30, 2026, all incoming and outgoing phone calls, voice-mails, and all instant messages associated with the Account(s) including stored or preserved copies of instant messages (including SMS messages and MMS messages) sent to and from the Account(s) (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

18. For the period October 1, 2024 to January 30, 2026, all activity relating to chats, such as Google Hangouts, including, but not limited to: all communications, including audio, video, text message and/or chat communications, and all data associated therewith;

19. For the period October 1, 2024 to January 30, 2026, all information for the Google Plus profile associated with the Account(s), including all status updates, tag-lines, profile photos, background photos, cover photos and other information regarding the user of the profile, comments, items shared by or with the profile, links to videos, photographs, articles, and other items, contact or "circle" lists created by the profile, contact or "circle" lists or other groups and networks of which the profile is a member, profiles or other items "followed" by the user of the profile, Google Plus users that

"followed" the profile, and information about access and use of Google Plus;

20. For the period October 1, 2024 to January 30, 2026, all call detail records, connection records, SMS, MMS, voice-mail messages sent by or from the Google Voice associated with the account;

21. For the period October 1, 2024 to January 30, 2026, all Web activity, including records of Internet browsing history from mobile searches, desktop browser searches, and searches from the Google accounts;

22. For the period October 1, 2024 to January 30, 2026, recent application usage associated with the Account(s) or its users (such as information collected through tracking cookies)

23. For the period October 1, 2024 to January 30, 2026, all activity relating to Google Photos, including, but not limited to: all images, graphic files, video files, and other media files stored in the Account(s), and/or were uploaded to or downloaded from any other Google service, and all data associated therewith, including the metadata for each file; and

24. For the period October 1, 2024 to January 30, 2026, all records pertaining to communications between Google and any person regarding the Account(s), including contacts with support services and records of actions taken.

Google is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## I. Information to be seized by the government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 18 U.S.C. § 1956(a)(1)(B) (concealment money laundering), 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity), 18 U.S.C. § 1956(h) (money laundering conspiracy), 18 U.S.C. §§ 371 (conspiracy to violate the laws of the United States), 2314 (interstate transportation of stolen goods), and 2315 (sale or receipt of stolen goods, securities, or moneys) ("TARGET OFFENSES") as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

a. Information that constitutes evidence of the identification or location of the user(s) of the Account;

b. Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

c. Information that constitutes evidence indicating the Account user's state of mind, e.g., intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

d. Evidence indicating how and when the account was used to determine the chronological context of account use, account access, and events relating to the crime under investigation;

e. Evidence indicating the geographic location of devices accessing the account at times relevant to the investigation;

f. Nature, types, amounts, value, and prices of goods, wares, merchandise, money, and other valuable items stolen;

g. Lists of locations targeted for burglaries, and lists of items sold, resold, transmitted, or converted;

h. Records and information about the transportation, transmission, transfer, or movement in interstate or foreign commerce of goods, wares, merchandise, money, and other valuable items stolen, including the victims, entities, physical addresses;

i. Records (including communications) and tangible objects relating to the existence, scope, objects, membership, and overt acts taken in furtherance of a conspiracy, including but not limited to the identities, entities, physical addresses, vehicles, travel, movement, location, and telephone numbers of the following:

    a. DOMINICK LUNA

    b. JHON ANDERSON GONZALEZ CAICEDO

    c. WILVER MANYOMA MEJIA

    d. ANDRES MAURICIO MELVIS HURTADO

    e. JANELLY XIMENA ANGULO PEREA.

j. Any information related to the source of funds used to rent, purchase, or use flights, rental cars, lodging, or other means of transportation.

k. Any information related to the resale, conversion, or disposition of goods, wares, merchandise, money, and other valuable items stolen.

l. Any information about the communication or coordination of co-conspirators, including but not limited to LUNA, JHON, WILVER, ANDRES, and JANELLY, including the schedule, location, or travel of the co-conspirators, including by flight and rental vehicle.

m. All bank records, checks, credit card bills, account information, cryptocurrency accounts, cryptocurrency wallets, cryptocurrency transactions, and other financial records.

n. Any information about encrypted communication applications, including FaceTime, Telegram, Signal, and WhatsApp between and amongst subjects, witnesses, and co-conspirators.

o. Any information relating to the ports of entry, admission to the United States, false statements in registration applications and travel visas, failure to notify authorities of a change of address while on a visa, or counterfeiting of any travel document or identification document.

p. Records and information pertaining to the payment, receipt, sale, transfer, or storage of money or other things of value by LUNA, JHON, WILVER, ANDRES, JANELLY, or any known or unknown co-conspirators, that relate to or include monies derived from burglaries including:

    a. Bank, credit union, investment, money transfer, and other financial accounts including cryptocurrency accounts or wallets.

    b. Credit and debit card accounts.

    c. Cryptocurrency accounts or "wallets."

    d. Tax statements and returns.

e. Business or personal expenses.

f. Income, whether from wages or investments; and

g. Loans.

q. Records and tangible objects pertaining to the residence and travel or whereabouts of LUNA, JHON, WILVER, ANDRES, and JANELLY and any other identified co-conspirators during the time period between October 1, 2024 and January 28, 2026.

r. Records and tangible objects pertaining to the source, receipt, sale, or transfer of any burglarious tools including, but not limited to window punches, lock pick kits, wi-fi jamming kits and antennas, backpacks, masks, gloves, cellular devices.

s. Records and tangible objects pertaining to the obtainment, receipt, sale, negotiation, or transfer of any fraudulent identifying documents including the purchase, sale, transfer, obtainment of any identification cards, debit cards, passports, drivers' licenses, and/or residential or storage rental agreements, bank accounts, car rental agreements and airline flights.

t. Records and tangible objects relating to the ownership, occupancy, or use of the addresses listed above such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers.

u. Communications related to schemes to defraud and communications related to the payment/transfer/deposit/withdrawal/conversion/storage/transportation of monetary instruments (currency, traveler's checks in any form, all negotiable instruments, incomplete instruments, securities or stock in bearer form or otherwise, digital currency (virtual currency, crypto currency), goods, wares,

merchandise, money, and other valuable items stolen, including e-mails, videos, photographs, instant messages, chat logs, correspondence attached to e-mails (or drafts), calendar entries, contact lists, and text messages.

v. Communications regarding schedules and travel, activity conducted, or preparatory steps taken in furtherance of the scheme under investigation.

w. All financial records, bills, and account information, including evidence indicating the transfer or control of any proceeds of the scheme under investigation.

x. All records or information related to schemes to defraud and the receipt and disposition of proceeds of such schemes

y. Records and information related to any premises where any co-conspirators have resided or visited (temporary, permanent, or otherwise).

z. Evidence of user attribution showing who used or owned the account at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

aa. Evidence indicating the account user's state of mind as it relates to the crimes under investigation.

bb. The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s).

cc. The identity of the person(s) who communicated with the account about matters relating to the TARGET OFFENSES, including records that help reveal their whereabouts.

dd. Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

information associated with the Google LLC account number 348579712231 and email address lunascleaning57@gmail.com, that is stored at premises controlled by Google LLC

Case No. 26-981M(NJ)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the ______________ District of ______________________ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1956(a)(1)(B), 1957, 1956(h), 371, 2314, and 2315 | concealment money laundering, monetary transactions in property derived from SUA, money laundering conspiracy, conspiracy to violate the laws of the United States, interstate transportation of stolen goods, and sale or receipt of stolen good |

The application is based on these facts:

See the attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

ELIJAH STEIMLE Digitally signed by ELIJAH STEIMLE Date: 2026.07.28 12:00:50 -05'00'

*Applicant's signature*

Elijah Steimle, Special Agent (FBI)

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 7/29/2026

[signature]

*Judge's signature*

City and state: Milwaukee, Wisconsin

Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Elijah Steimle, being duly sworn, hereby depose and state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with LUNASCLEANING57@GMAIL.COM, that are stored at premises owned, maintained, controlled, or operated by Google LLC ("Google"), an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since June 2022. I am currently assigned to the Milwaukee Field Office and previously worked on the Homeland Security Task Force ("HSTF"). The primary mission of the HSTF is to identify, investigate, disrupt, and dismantle transnational criminal organizations and their associates operating in communities in and around the greater Milwaukee area. My responsibilities include the investigation of possible violations of federal law, including weapons trafficking, narcotics trafficking, human trafficking, money laundering, conspiracy to commit offenses or to defraud the United States, interstate transfer of stolen goods, the sale of said stolen goods, bank fraud, and aggravated identity theft.

3. As an FBI Special Agent, I have participated in a wide variety of federal investigations and debriefed or participated in the debriefings of defendants, informants, and witnesses. I have participated and conducted physical and electronic surveillance, analyzing telephone toll information obtained through subpoenas, analyzing information obtained through court-ordered pen registers and trap-and-trace intercepts, overseeing the activities of and debriefing informants, and executing arrest and search warrants including phone and device extractions. I have also conducted federal investigations into the use of fraudulent identifications, bank fraud, money laundering, and wire fraud. Based on my training and experience, I am familiar with the use of cellphones and other forms of technology to communicate, coordinate, and facilitate the commission of these crimes.

4. The facts stated herein are based on my own personal involvement with this investigation as well as from information provided to me by other law enforcement officers involved in the investigation. Because this affidavit is submitted for the limited purpose of securing authorization for the requested search warrants, I have not included each and every fact known to me concerning this investigation. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1956(a)(1)(B) (concealment money laundering), 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity), 18 U.S.C. § 1956(h) (money laundering conspiracy), 18 U.S.C. §§ 371 (conspiracy to violate the laws of the United States), 2314 (interstate transportation of stolen goods), and 2315 (sale or receipt of stolen goods, securities, or moneys) ("TARGET OFFENSES")

have been committed by DOMINICK LUNA ("LUNA"), JHON ANDERSON GONZALEZ CAICEDO ("JHON"), WILVER MANYOMA MEJIA ("WILVER"), ANDRES MAURICIO MELVIS HURTADO ("ANDRES"), JANELLY XIMENA ANGULO PEREA ("JANELLY), and others known and unknown. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and fruits of these crimes further described in Attachment B.

**JURISDICTION**

6. This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), and 3 (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

7. In January 2026, the FBI Milwaukee HSTF became aware of an investigation by the Ozaukee County Sheriff's Office ("OCSO") involving a break-in and burglary targeting a family in Beaver Dam, Wisconsin. As a part of that investigation, LUNA, JHON, WILVER, and ANDRES were arrested and charged by the Ozaukee County District Attorney's Office with receiving stolen property greater than $10,000, a felony, in violation of Wisconsin Statute 943.34(1)(c), in Ozaukee County Case Numbers 2026CF000029, 2026CF000030, 2026CF000031, and 2026CF000032.

8. As a result of that investigation, the United States, including the FBI, is now investigating LUNA, JHON, WILVER, ANDRES, JANELLY, and others known and unknown, for violations of 18 U.S.C. § 1956(a)(1)(B) (concealment money laundering), 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity), 18

U.S.C. § 1956(h) (money laundering conspiracy), 18 U.S.C. §§ 371 (conspiracy to violate the laws of the United States), 2314 (interstate transportation of stolen goods), and 2315 (sale or receipt of stolen goods, securities, or moneys) ("TARGET OFFENSES").

Burglary in Beaver Dam, Wisconsin – January 27, 2026

9. On January 27, 2026 at approximately 6:48 p.m., the Beaver Dam Police Department received a report of suspicious activity near VICTIM 1's residence.[1] The complainant, an off-duty Beaver Dam Police Department officer, reported that their exterior security cameras observed an individual running through backyards carrying something. Officers from the Beaver Dam Police Department responded to the area and identified footprints in the snow leading from the back of a parking lot of ProCon Converting Coating and Paper Solutions ("ProCon") directly to the back patio door of VICTIM 1's address. Officers activated emergency lights and set up a perimeter around VICTIM 1's address. An officer contacted VICTIM 1, who was an owner of a local Chinese restaurant. VICTIM 1 told officers that his/her house was locked, no one was home, and they were not expecting visitors. Officers discovered that the glass patio door at the back of the house on the northwest corner was shattered. VICTIM 1 provided the Beaver Dam Police Department with the house keys, and officers then entered, cleared the residence, and determined that no one was inside.

10. After searching the residence, VICTIM 1 reported that the suspects stole approximately $700,000.00 in cash and various pieces of jewelry, including one gold necklace with a heart pendant, four matching gold bracelets, several gold rings, one Chinese brand watch, and one Casio solar powered watch.

---

[1] VICTIM 1's identity is known to law enforcement, but is not included in the affidavit for the victim's privacy and safety.

11. The Beaver Dam Police Department contacted ProCon to access surveillance footage of the parking lot that abutted the back of VICTIM 1's residence. Officers observed a dark Dodge Durango that appeared to have a front and rear license plate. Officers observed the suspect vehicle activity below (all times are approximate):

a. 6:10 p.m.: The Dodge Durango enters ProCon's parking lot from the south, stops at the end of the building for a moment or two, and then leaves the parking lot.

b. 6:27 p.m.: The Dodge Durango returns to ProCon's parking lot from the north, pulls into a stall for a few moments, and then leaves the north side of the building and leaves the parking lot.

c. 6:37 p.m.: The Dodge Durango returns to ProCon's parking lot from the south and stops along the back of the parking lot. The driver exited the vehicle and walked around behind the vehicle and appeared to be talking on a cell phone. At approximately 6:39 p.m., a vehicle occupied by a cleaning crew, pulled into the ProCon parking lot and backed up into the garbage bins. As the cleaning crew vehicle was backing up, the Dodge Durango's lights came on and the Dodge Durango backed up out of the stall, made a U-turn and left the parking lot.

d. 6:45 p.m.: The Dodge Durango returned to ProCon's parking lot.

e. 6:48 p.m.: The Dodge Durango left the ProCon parking lot.

12. The Beaver Dam Police Department queried the Flock camera system for a dark colored Dodge Durango in the area of the incident, given the known direction of travel of the suspect vehicle out of the ProCon parking lot. The Beaver Dam Police Department identified a black Dodge Durango bearing Nebraska license plate BFN686 as the suspect vehicle.

13. On January 27, 2026 at about 11:00 p.m., the Ozaukee County Sheriff's Office was notified by the Beaver Dam Police Department that the Dodge Durango (NE: BFN-686) had been involved in the residential burglary. The Ozaukee County Sheriff's Office queried the Flock's traffic camera system, which revealed that the Dodge Durango (NE: BFN-686) had traveled to Ozaukee County after the burglary in Beaver Dam, Wisconsin.

14. On January 28, 2026 at approximately 3:46 a.m., Deputy Michael Zilke of the Ozaukee County Sheriff's Office observed the Dodge Durango (NE: BFN-686) parked in the driveway of a residence located at 5XX Lake Shore Road, Grafton, Wisconsin later identified as a short-term rental property.[2] After requesting additional law enforcement, law enforcement officers established a perimeter around the residence and activated emergency lights and sirens in the front of the residence. At that time, two individuals ran from the residence away from where the law enforcement vehicles were positioned. Officers maintaining the perimeter attempted to apprehend the suspects, who then retreated into the residence.

15. Law enforcement officers ordered the occupants to exit the residence located at 5XX Lake Shore Road, Grafton, Wisconsin using a loudspeaker. Eventually, three individuals—LUNA, JHON, and WILVER—exited the residence and were taken into custody. Shortly thereafter, a fourth individual—ANDRES—exited the residence and was also taken into custody. The fourth individual had insulation on his clothing, and law enforcement officers later determined that ANDRES had fallen through the living room ceiling, where a bag containing a large amount of U.S. currency was eventually located.

16. Upon searching the residence, the Ozaukee County Sheriff's Office located approximately $569,086.56 in cash. The Ozaukee County Sheriff's Office also seized five cell

[2] The address is known to law enforcement, but is not listed in the affidavit to protect the owner's identity.

phones from LUNA, JHON, WILVER, and ANDRES and from the short-term rental property in Grafton, Wisconsin.

17. Law enforcement entered the residence to check for any additional occupants. While clearing the residence, law enforcement observed the following items:

a. A safe in the corner of the basement, with the safe door damaged and opened.

b. Several grocery bags containing U.S. currency near the safe and HVAC equipment in the basement.

c. A plastic bag containing a substantial amount of U.S. currency, estimated to be hundreds of thousands of dollars, which was located coming through the ceiling in the main floor of the residence and partially visible through a hole in the ceiling drywall.

d. A piece of paper located in the toilet bowl of the basement bathroom, which contained a list of over 30 addresses from various jurisdictions in Wisconsin, including Franklin, Wauwatosa, Menomonee Falls, Mequon, Cedarburg, West Bend, Grafton, Sussex, Beaver Dam, Columbus, Marshall, Lake Mills, Johnson Creek, Watertown, Oconomowoc, Waukesha, Brookfield, New Berlin, and Mukwonago.

18. The Ozaukee County Sheriff's Office contacted law enforcement agencies in many of these jurisdictions to determine whether any of the residences had been burglarized, and learned that several of the listed addresses in Menomonee Falls, West Bend, and New Berlin had been burglarized dating back to 2023.

19. The individuals who exited the residence were subsequently identified as:

a. DOMINICK LUNA:

i. DOB: 09/04/1993

ii. Address: 13918 Westheimer Road, Houston, TX 77077

iii. Phone Number: 207-922-0800

b. JHON ANDERSON GONZALEZ CAICEDO:

i. DOB: 04/07/1998

ii. Phone Number: 908-836-5757

c. WILVER MANYOMA MEJIA:

i. DOB: 01/17/1984

d. ANDRES MAURICIO MELVIS HURTADO:

i. DOB: 07/05/1988

ii. Address: 2700 Woodland Park Drive, Apt 1205, Houston, TX 7082.

20. The Ozaukee County Sheriff's Office obtained photo identification cards from LUNA, JHON, WILVER, and ANDRES. Below is a summary of the identification cards obtained:

a. DOMINICK LUNA:

i. Texas Driver's License bearing license number 38177072

1. DOB: 09/04/1993

2. Address: 13918 Westheimer Road, Apt 467, Houston, TX

b. JHON ANDERSON GONZALEZ CAICEDO

i. Colombian Passport bearing passport number AY589843

1. DOB: 04/07/1998

c. WILVER MANYOMA MEJIA:

i. Colombian Passport bearing passport number AX869803

1. DOB: 01/17/1984

d. ANDRES MAURICIO MELVIS HURTADO:

   i. Colombian Passport bearing passport number AZ897818

      1. DOB: 07/05/1988

   ii. New York City Identification Card bearing number 16242756558680

      1. DOB: 07/05/1988

      2. Address: 8605 91st Avenue, Fl 2, Woodhaven, NY.

21. I have reviewed the photos of the identification cards and the booking photographs from the Ozaukee County Sheriff's Office for LUNA, JHON, WILVER and ANDRES and have used these means of identification as a basis of comparison throughout this affidavit.

22. When LUNA, JHON, WILVER and ANDRES were taken into custody, the following cellular devices were located and seized as evidence. Investigators seized the following:

a. DEVICE 1: A white-and-silver Apple iPhone with a black case (Ozaukee County Sheriff's Office Property Item # 26-49-1), which was found in the possession of LUNA.

b. DEVICE 2: A gray Apple iPhone with a custom photograph case (Ozaukee County Sheriff's Office Property Item #26-49-2), which was found in the possession of LUNA.

c. DEVICE 3: A black Apple iPhone with a clear case (Ozaukee County Sheriff's Office Property Item #26-49-3), which was found in the possession of LUNA.

d. DEVICE 4: A gray Apple iPhone which was taken from jail property bag #114 (Ozaukee County Sheriff's Office Property Item #26-50-1), and is listed as in the possession of ANDRES.

e. DEVICE 5: A white-and-silver Apple iPhone with a pink case found in a fake tree flowerpot next to the front door inside of the residence located at 5XX Lake Shore Road, Grafton, Wisconsin (Ozaukee County Sheriff's Office Property Item #26-56-2).

23. During the search of the residence located at 5XX Lake Shore Road, Grafton, Wisconsin, the Ozaukee County Sheriff's Office discovered and seized approximately $569,086.56 in cash.

24. Officers determined that the residence was being utilized as an Airbnb and was rented to LUNA. The owner of the residence was contacted and determined to be out of town. The Ozaukee County Sheriff's Office confirmed the residence was rented under LUNA's name for the time period of January 26, 2026 to January 31, 2026.

25. On or about April 21, 2026, an employee[3] of the Airbnb located at 5XX Lake Shore Road, Grafton, Wisconsin contacted the Ozaukee County Sheriff's Office and reported that while he/she was checking the furnace, he/she noticed a designer handbag tucked above the furnace's duct, which sat between the duct and the ceiling of the basement. The employee removed the bag and noted that the bag was full of cash. Ozaukee County Sheriff's Office responded to the scene and took custody of the handbag with cash. Ozaukee County Sheriff's Office counted the currency and the total currency in the handbag was approximately $197,275.00.

26. I believe the subjects hid the handbag with money prior to getting arrested. The total amount of money recovered from 5XX Lake Shore Road, Grafton, Wisconsin was approximately $766,361.56, which includes approximately $569,086.56 recovered on January 28, 2026 and $197,275.00 recovered on April 21, 2026.

[3] The name of the employee is known to law enforcement, but is not included to protect the identity of the witness.

27. On or about March 2, 2026, Airbnb Inc. ("hereinafter referred to as "Airbnb Records") produced records for the account associated with the rental property located at XX Lake Shore Road, Grafton, Wisconsin between January 26, 2026 and January 31, 2026, which listed the following information:

a. Account Information:

i. Name: Dominick Luna

ii. User ID: 664447660

iii. Email: dnick93@icloud.com

iv. Phone Number:

1. 346-605-4169

2. 207-922-0800

b. Rental History[4] (01/01/2023-01/31/2026):

i. 11/30/2024-12/06/2024 (North Locust Street, Appleton, WI)

ii. 04/10/2025-04/14/2025 (Coquina Drive, North Bay Village, FL)

iii. 06/01/2025-06/03/2025 (Collins Avenue, Miami Beach, FL)

iv. 09/15/2025-09/21/2025 (Western Avenue, Green Bay, WI)

v. 09/22/2025-09/25/2025 (Boxwood Drive, Rockford, IL)

vi. 09/25/2025-09/26/2025 (Dearbaugh Avenue, Wapakoneta, OH)

vii. 11/09/2025-11/12/2025 (Somerset Lane, Fort Wayne, IN)

viii. 12/09/2025-12/15/2025 (Chartiers Avenue, Pittsburgh, PA)

ix. 12/15/2025-12/18/2025 (Russell Avenue, Akron, OH)

[4] The full addresses of the rental properties are known to law enforcement, but are not included to protect the integrity of the investigation and the safety and identity of the witnesses.

x. 01/20/2026-01/26/2026 (Logan Avenue, Des Moines, IA)

xi. 01/26/2026-01/31/2026 (Lake Shore Road, Grafton, WI).

28. The Ozaukee County Sheriff's Office obtained a rental receipt for the Dodge Durango (NE: BFN-686) from Enterprise Rent-A-Car, which listed the following reservation details:

a. Pick-Up/Return Location: Des Moines International Airport

b. Rental Dates: January 20, 2026 to January 28, 2026

c. Renter Name: ANDRES MAURICIO MELVIS HURTADO

29. On or about March 11, 2026, JP Morgan Chase produced records for the account information relating to LUNA, WILVER and JHON. The JP Morgan Chase records revealed the following accounts associated with LUNA, WILVER and JHON:

a. Account Number: 600362183 – LUNA/JHON (Joint Checking)

  i. Opened: 05/03/2024

b. Account Number: 763428300 – LUNA (Individual Checking)

  i. Opened: 11/23/2024

c. Account Number: 767035960 – LUNA (Individual Checking)

  i. Opened: 01/03/2025

d. Account Number: 2900482170 – LUNA (Individual Checking)

  i. Opened: 03/12/2025

e. Account Number: 608887116 – JHON (Individual Checking)

  i. Opened: 06/12/2024

f. Account Number: 2905355236 – JHON (Individual Checking)

  i. Opened: 9/29/2025

ii. Phone Number: 908-836-5757

g. Account Number: 5036318576 – JHON (Individual Savings)

i. Opened: 06/12/2024

h. Account Number: 600368891 – WILVER (Individual Checking)

i. Opened: 05/03/2024.

30. JP Morgan Chase Records revealed that between January 27, 2026 and January 28, 2026, a total of approximately $52,720.00 was deposited via 15 separate ATM deposits at 120 North Port Washington, Grafton, WI to LUNA's accounts bearing account numbers 2900482170 and 763428300.

31. JP Morgan Chase Records included ATM video surveillance footage for the ATM transactions from January 27, 2026 and January 28, 2026. I reviewed the ATM video surveillance footage provided by JP Morgan Chase, which showed the following:

a. January 27, 2026: The video surveillance depicts two individuals conducting transactions. I believe the individuals in the video surveillance footage is LUNA and WILVER.

b. January 28, 2026: The video surveillance depicts one individual conducting transactions. I believe the individual in the video surveillance footage is LUNA.

32. JP Morgan Chase Records revealed that on January 27, 2026, from account number 2900482170, LUNA made two Zelle payments totaling $9,900.00 to "JANELLY ANGULO". I believe this was payment to JANELLY.

33. JP Morgan Chase Records revealed that on consecutive days between February 3, 2026 and February 11, 2026, there were nine separate ATM withdrawals from LUNA's account number 767035960 totaling $9,000.00. Each transaction was for $1,000.00. The transactions were

conducted at 10411 Westheimer Road, Houston, TX 77042 (two transactions) and 11560 Westheimer Road, Houston, TX 77077 (seven transactions). I understand that LUNA, WILVER, JHON and ANDRES were arrested on January 28, 2026 and in custody in Wisconsin between February 3, 2026 and February 11, 2026.

34. JP Morgan Chase records included ATM video surveillance footage for the ATM transaction between February 3, 2026 and February 11, 2026. I reviewed the ATM video surveillance footage for each transaction and believe the same individual conducted all nine transactions. For each transaction, except for the ATM transaction occurring on February 7, 2026, the individual conducting the transaction was driving a silver SUV Infiniti with Texas license plate VFM2302. The ATM video surveillance footage revealed that the individual had a visible cell phone during the transactions taking place on February 3, February 5, February 8, February 9, February 10, and February 11.

35. On or around May 16, 2026, I requested and received the registered owner information for Texas license plate VFM2302. The registered owner return stated that plate VFM2302 was cancelled on April 7, 2026. The return revealed the VIN assigned to VFM2302 was 3PCAJ5M37KF13832, which revealed a 2019 Infiniti QX50. The vehicle from the ATM video surveillance footage is consistent with a 2019 Infiniti QX50. The registered owner return listed the current owner's title issued on April 15, 2026. The registered owner return listed the previous owner title issue date as October 15, 2025 and the previous owner as JANELLY XIM ANGULO PEREA. I believe that JANELLY was the registered owner of the silver Infiniti (TX: VFM2302) between October 15, 2025 and April 7, 2026.

36. I reviewed a picture of JANELLY's Texas driver's license and compared the driver's license photo to the ATM video surveillance footage. I believe that JANELLY is the

individual that conducted the nine ATM withdrawals from LUNA's JP Morgan Chase account between February 3, 2026 and February 11, 2026.

Burglary in Manitowoc, Wisconsin - January 25, 2025

37. On or about March 20, 2026, I met with Manitowoc (Wisconsin) Police Department Detective Jason Denk regarding residential burglaries that had occurred in Manitowoc, Wisconsin. On or about January 25, 2025, the Manitowoc Police Department responded to a residential burglary at 1XXX Tanglewood Road, Manitowoc, Wisconsin where approximately $32,350.00 in designer handbags and approximately $30,000.00 in U.S. currency were stolen. Through a neighborhood canvass and video surveillance, the Manitowoc Police Department identified a vehicle of interest related to the burglary as a black Nissan Pathfinder bearing Illinois license plate FP280926. Investigators later determined that the Nissan Pathfinder (IL: FP280926) was a rental car from Enterprise Rent-A-Car, which was rented by LUNA.

38. I received a police report from the Manitowoc Police Department (Case Number: 2025-00000871) describing the investigation of that residential burglary. VICTIM 2[5] was the owner of an Asian restaurant and reported that while at work on January 25, 2025, at approximately 6:31 p.m. CST, VICTIM 2 received a notification of a motion detection on VICTIM 2's security camera and the video surveillance showed two unknown men walking through VICTIM 2's kitchen. The next motion capture on VICTIM 2's security camera was at approximately 8:07 p.m. CST when VICTIM 2 returned home with his/her family. VICTIM 2 stated the individuals forced entry at a door that was in the back of the house and the window panel closest to the door was shattered open. VICTIM 2 stated that his/her family never used the back door.

[5] VICTIM 2's identity is known to law enforcement, but is not included in the affidavit to protect the victim's identity.

39. VICTIM 2 reported that his/her bedroom was rummaged through the most. Particularly, VICTIM 2 reported that in his/her closet, VICTIM 2 was missing approximately $32,350.00 in designer handbags. VICTIM 2 stored cash inside the designer handbags and estimated that approximately $30,000.00 in U.S. Currency was inside the various designer handbags that were taken.

40. On or around January 25, 2025, the Manitowoc Police Department performed a neighborhood canvass to determine if any nearby residents had observed suspicious activity. A nearby resident[6] reviewed his/her doorbell camera footage and stated he/she observed a suspicious black SUV that was not normal for the area. The witness observed the vehicle on his/her camera at approximately 2:15 p.m., 5:00 p.m., 5:49 p.m. and approximately three to four times between 6:00 p.m. and 6:30 p.m. CST. The Manitowoc Police Department conducted a query of city intersection cameras near VICTIM 2's residence and located a black Nissan Pathfinder bearing Illinois license plate at approximately 2:13 p.m. The vehicle was later identified as a black Nissan Pathfinder bearing Illinois license plate FP280926.

41. The Manitowoc Police Department reviewed City of Manitowoc traffic cameras and identified that at approximately 5:10 p.m. CST the black Nissan Pathfinder (IL: FP280926) parked in the parking lot of the Quality Inn hotel located at 2200 S 44th Street, Manitowoc, WI. The Manitowoc Police Department contacted Quality Inn and reviewed video surveillance footage around 5:10 p.m. After reviewing the video footage, Manitowoc Police Department confirmed that LUNA was the individual from the video surveillance footage and LUNA checked into Quality Inn on or around January 24, 2025. Review of the Quality Inn video surveillance camera footage revealed two other individuals with LUNA.

[6] The resident's name and address is known to law enforcement, but is not included in the affidavit to protect the witness' identity.

42. I reviewed the Quality Inn video surveillance camera footage, and I believe the two individuals with LUNA are JHON and WILVER.

43. The Manitowoc Police Department contacted Enterprise Rent-A-Car to inquire about the rental information for the black Nissan Pathfinder (IL: FP280926), which revealed that the black Nissan Pathfinder (IL: FP280926) had been rented by LUNA with an address of 13918 Westheimer Road, Houston, TX. The vehicle was rented by LUNA from the Milwaukee International Airport on January 23, 2025 at approximately 3:21 p.m. CST and was returned on January 27, 2025 at approximately 3:00 p.m. CST.

44. On or around March 18, 2026, Enterprise Mobility produced records for the account information relating to LUNA and ANDRES. The Enterprise records revealed the following account information:

a. LUNA:

  i. Customer Number: 316802585

  ii. E-Mail Address: lunascleaning57@gmail.com

  iii. Phone Number: 702-319-6065

  iv. Address: 13918 Westheimer Road, Houston, TX 77077

b. ANDRES:

  i. Customer Number: 367075116

  ii. E-Mail Address: andresmelvis348@icloud.com

  iii. Phone Number: 347-940-3036

  iv. Address: 2700 Woodland Park Drive, Apt 1205, Houston, TX 77082

45. JP Morgan Chase records revealed that on or about January 25, 2025, a total of approximately $29,263.00 was deposited via eleven ATM Deposits at 5909 West Mequon Road,

Mequon, WI in the aforementioned JP Morgan Chase Accounts. Below is a breakdown of the deposits:

a. 600368891 – WILVER (Individual Checking)
   i. Total Deposit: $7,113.00 (three transactions)
b. 763428300 – LUNA (Individual Checking)
   i. Total Deposit: $14,800.00 (two transactions)
c. 608887116 – JHON (Individual Checking)
   i. Total Deposit: $2,000.00 (one transaction)
d. 5036318576 – JHON (Individual Savings)
   i. Total Deposit: $5,350.00 (two transactions)

46. JP Morgan Chase records revealed that on or about January 24, 2025, there was a Subway purchase in Manitowoc, WI for $44.25 from account number 767035960. Account number 767035960 is an individual checking account owned by LUNA.

47. I reviewed the Quality Inn security video surveillance footage, which revealed a video of LUNA carrying a Subway bag into the Quality Inn hotel. The video had a date and time stamp of January 24, 2025 at 20:19:01.

Burglary in Howland, Ohio – March 6, 2025

48. The Ozaukee County Sheriff's Office identified another police report incident from the Howland Police Department in Howland, Ohio. On or about March 6, 2025, a residential burglary happened at 3XXX Hightree Avenue SE, Warren, OH, where approximately $10,000 in U.S. currency was stolen. Through video surveillance and Flock camera(s), the Howland Police Department identified the vehicle used during that burglary as a Mitsubishi Outlander bearing Missouri registration A102B4. Investigators later determined that the Mitsubishi Outlander (MO: A102B4) was a rental car from Enterprise Rent-A-Car, which had been rented by LUNA.

49. The Ozaukee County Sheriff's Office obtained a police report from the Howland Police Department (Incident Number 25-01546) describing the investigation of that residential burglary. VICTIM 3[7] reported that on March 6, 2025, VICTIM 3 and his/her family had returned to their residence at approximately 8:50 p.m. Eastern Standard Time (EST) and discovered the inside glass door attached to the rear breezeway was broken. VICTIM 3 reported the incident to Howland Police Department at approximately 9:02 p.m. (EST). VICTIM 3 noted that the security system in VICTIM 3's residence showed that the subjects entered the residence at approximately 7:49 p.m. EST and exited at approximately 8:01 p.m. VICTIM 3 reported that approximately $10,000.00 in cash, a Play Station 5 and games, and a necklace were taken from the residence.

50. The Howland Police Department canvassed local residences and obtained video surveillance footage from various locations around VICTIM 3's residence. The Howland Police Department observed a dark SUV enter the area of VICTIM 3's residence at approximately 5:22 p.m. and the vehicle was parked at the residence between 6:47 p.m. EST and 6:49 p.m. EST. Additionally, video surveillance showed the vehicle stopping in front of the residence at approximately 8:01 p.m. Upon reviewing the surveillance video and based on video enhancement, the Howland Police Department believed the vehicle matched the description of a Mitsubishi Outlander.

51. The Howland Police Department queried Flock cameras and confirmed the suspect vehicle to be a Mitsubishi Outlander bearing Missouri license plate A102B4. Mitsubishi Outlander (MO: A102B4) had approximately 13 Flock Camera hits between approximately 4:13 p.m. and 8:11 p.m.

[7] VICTIM 3's identity is known to law enforcement but is not included in the affidavit to protect the victim's identity.

52. The Howland Police Department contacted Enterprise Rent-A-Car to inquire about the rental information for the Mitsubishi Outlander (MO: A102B4), which showed that the Mitsubishi Outlander (MO: A102B4) had been rented to LUNA using Texas Driver's License bearing license number 38177072, and listing his address as 13918 Westheimer Road, Apartment 467, Houston, TX 77077, and phone numbers as 702-319-6065 and 346-649-2065. The Mitsubishi Outlander (MO: A102B4) was rented at the Cleveland International Airport on March 4, 2025 and returned on March 7, 2025.

53. JP Morgan Chase records revealed that between March 6, 2025 and March 8, 2025, LUNA, WILVER and JHON made ATM deposits of approximately $125,929.00. There were total of 19 separate ATM Deposits, 11 of which were made at an ATM located at 4600 Dressler Road, NW Canton, OH and eight of them were made at an ATM located at 219 North Main Street, North Canton, OH. Below is a breakdown of the deposits:

a. 5036318576 – JHON (Individual Savings): $26,450.00 Deposited
    i. 03/07/2025: $3,200.00 Deposited (one transaction)
    ii. 03/08/2025: $23,250.00 Deposited (three transactions)
b. 600368891 – WILVER (Individual Checking): $40,229.00 Deposited
    i. 03/07/2025: $7,600.00 Deposited (two transactions)
    ii. 03/08/2025: $32,629.00 Deposited (five transactions)
c. 763428300 – LUNA (Individual Checking): $26,150.00 Deposited
    i. 03/08/2025: $26,150.00 Deposited (three transactions)
d. 767035960 – LUNA (Individual Checking): $33,100.00
    i. 03/06/2025: $5,100.00 Deposited (one transaction)
    ii. 03/08/2025: $28,000.00 Deposited (four transactions)

54. JP Morgan Chase records revealed that on March 9, 2025, from account number 600368891, WILVER made a Zelle payment of $2,000.00 to "ANDRES MELVIS." I believe this was payment to ANDRES.

55. On or about February 24, 2026, Bank of America produced records for the account information relating to WILVER. The Bank of America records revealed that WILVER was the sole account owner of account number 488107822897. The Bank of America records revealed that on March 9, 2025, two ATM deposits were made into account 488107822897 totaling $9,250.00. The Bank of America records revealed that the deposit was made at an ATM located at Aurora Marketplace, Aurora, Ohio.

56. I conducted open-source research for Bank of America ATMs located in Aurora Marketplace in Aurora, Ohio, which revealed a walk-up ATM labeled Aurora Marketplace located at 7217 Aurora Road, Aurora, OH 44202.

57. The Bank of America records revealed that on March 3, 2025, WILVER received a Zelle payment from "JHON GONZALEZ CAICEDO" for $30.00. I believe this was payment received from JHON.

58. The Bank of America records revealed that on March 3, 2025, WILVER made a Zelle payment to "DOMINICK LUNA" for $30.00. I believe this was payment to LUNA.

59. The Bank of America records revealed that on March 10, 2025, WILVER made a Zelle payment to "Andres Melvis" for $120.00. I believe this was payment to ANDRES.

60. The Bank of America records revealed that on March 10, 2025, WILVER received two Zelle payment from "JHON GONZALEZ" totaling $716.00. I believe this was payment received from JHON.

61. Given the proximity of transaction dates between LUNA, JHON, WILVER, and ANDRES in relation to the date of VICTIM 3's burglary, as well as the proximity of the deposit location in relation to VICTIM 3's residence, I believe that the LUNA, JHON, WILVER, and ANDRES were together during VICTIM 3's residential burglary.

Burglary in Ledgeview, Wisconsin – December 4, 2024

62. On or around December 4, 2024, the Brown County Sheriff's Office were dispatched to a burglary at 6XX Trumpeter Trail, Ledgeview, Wisconsin 54115. VICTIM 4[8] reported that he/she found a broken window in the house when he/she arrived home and the house had been ransacked. VICTIM 4 reported that after arriving home, he/she saw the glass back door of the residence was smashed. VICTIM 4 reported that many items were missing from the home, including approximately $6,000.00 to $7,000.00 in U.S. currency, approximately $1,000.00 in various Hong Kong Dollars and various jewelry items. VICTIM 4 and his/her family are Asian American and owned a restaurant. The Brown County Sheriff's Office was not able to identify subjects for this case.

63. JP Morgan Chase records revealed that on December 5, 2024, LUNA, WILVER and JHON made ATM deposits of approximately $18,950.00. There were total of five separate ATM deposits, all of which were made at an ATM located at 3505 East Calumet Street, Appleton, WI. Below is a breakdown of the deposits:

a. 5036318576 - JHON (Individual Savings): $5,350.00 Deposited (five transactions)

b. 608887116 - JHON (Individual Checking): $2,000.00 Deposited (one transaction)

c. 600368891 - WILVER (Individual Checking): $7,113.00 Deposited (three transactions)

[8] VICTIM 4's identity is known to law enforcement, but is not included in this affidavit to protect VICTIM 4's identity.

d. 763428300 - LUNA (Individual Checking): $14,800.00 Deposited (two transactions)

64. I conducted a Google Maps search between VICTIM 4's address and 3505 E Calumet Street, Appleton, Wisconsin, which revealed an approximate travel distance of 28 miles.

65. I believe that the subjects that burglarized VICTIM 4's address included LUNA, JHON and WILVER.

Burglary in Amelia, Ohio – October 19, 2024

66. On or around October 19, 2024, the Clermont County Sheriff's Office responded to a burglary at 1XXX West Glenwood Court, Amelia, Ohio 45102. VICTIM 5[9] reported that someone broke into his/her residence and had taken numerous things. Clermont County Sheriff's deputies observed the back sliding glass door had been broken and there was glass on the floor. VICTIM 5 reported that he/she was missing five designer purses worth approximately $10,000.00, an unknown amount of jewelry valued at approximately $10,000.00, a handgun and approximately $3,600.00 in U.S. Currency. VICTIM 5 advised that his/her family owned a local Asian restaurant.

67. Clermont County Sheriff's Office deputies reviewed video surveillance footage from a nearby business and observed a silver/white SUV later identified as a Nissan Pathfinder. Clermont County Sheriff's Office queried Flock Safety database, which revealed that the Nissan Pathfinder had a Flock hit on October 17, 2024 at State Route 125 at Chapel Road. I utilized Google Maps to query the distance between VICTIM 5's residence and the location of the Flock hit, which revealed a distance of approximately 4 miles.

68. Clermond County Sheriff's Office received information about a similar incident reported to the Springboro Police Department.

---

[9] VICTIM 5's identity is known to law enforcement, but is not included in this affidavit to protect VICTIM 5's identity

Burglary in Springsboro, Ohio – October 22, 2024

69. On or around October 22, 2024, Springsboro Police Department was dispatched to a burglary at 5X Andover Drive, Springsboro, OH 45066. VICTIM 6[10] reported that there were two unknown individuals in his/her house actively stealing. VICTIM 6 was watching the interior surveillance footage in his/her residence and reported the two unknown individuals made entry into his/her home through the back exterior door by shattering the glass. When Springsboro Police Department arrived on scene, they cleared the residence and verified the unknown individuals were gone. When the Springsboro Police Department searched the residence, they discovered that the master bedroom on the second floor had been ransacked. VICTIM 6 reported that approximately $6,000.00 to $8,000.00 in U.S. Currency was in his master bedroom, which was taken. VICTIM 6 and his/her family owned a local Asian restaurant.

70. Springsboro Police Department reviewed the surveillance footage of a neighbor of VICTIM 6. VICTIM 6's neighbor observed a silver SUV that had made multiple passes on Andover Drive and stopped near his/her residence on several occasions, sometimes with the headlights off. Video surveillance was captured from 8:50 p.m. to 9:43 p.m., which revealed the SUV in the area.

71. Springsboro Police Department reviewed the City of Springsboro traffic cameras and discovered that at approximately 8:46 p.m., a silver Nissan Pathfinder was captured traveling southbound on State Route 741 and approaching Lytle Five Points Road. At approximately 8:48 p.m., the same vehicle was observed turning left onto SR 73. Springsboro Police Department utilized Flock Safety database and located a silver Nissan Pathfinder bearing Ohio registration KJP-3888, which was registered to EAN Holdings and further inquiry revealed that the vehicle

[10] VICTIM 6's identity is known to law enforcement, but is not included in this affidavit to protect VICTIM 6's identity

had been rented from Enterprise Rent-A-Car at Detroit Metro Airport by LUNA. The vehicle was rented on October 16, 2024 and returned on October 23, 2024.

72. The Springsboro Police Department queried the Flock Safety database, which revealed the vehicle was observed near Commerce Drive and State Route 122 in Middletown, Ohio. Springsboro Police Department contacted the Super 8 Motel located at 3533 Commerce Drive, Middletown, Ohio and the General Manager confirmed that LUNA rented a room from October 19, 2024 to October 23, 2024. Springsboro Police Department obtained copies of the hotel receipts and a photo copy of the driver's license utilized by LUNA. The driver's license is identical to the license recovered by Ozaukee County Sheriff's Office when LUNA was arrested. The hotel receipts revealed the following information:

a. Guest Name: Luna, Dominick

b. Phone Number: 346-608-6069

c. Address: 13918 Westheimer Road, Apartment 467, Houston, TX 77077

d. Room Number: 122

e. Check In Date: 10/19/2024

f. Check Out Date: 10/23/2024

73. JP Morgan Chase records revealed that on October 21, 2024, there was an ATM deposit into LUNA's account 600362183 for $550.00 at an ATM located at 1401 South Breiel Boulevard, Middletown, OH. Springsboro Police Department obtained video surveillance footage screenshots of the ATM deposit, which revealed a black male driver driving a silver vehicle similar to a Nissan Pathfinder. I reviewed screenshots of the video surveillance provided by Springsboro Police Department and I believe the individual driving the silver Nissan Pathfinder that made the ATM deposit was WILVER.

74. Springsboro Police Department received information from Spirit Airlines pursuant to a subpoena. The records revealed that LUNA traveled from Houston, Texas to Detroit, Michigan and was accompanied by WILVER and Jean Bache Molina (DOB: 10/XX/1974). Springsboro Police Department later revealed that Molina was charged with burglary in the City of Rosenberg, Texas on or around January 10, 2025.

75. The residences of VICTIM 5 and VICTIM 6 are approximately 44 miles apart. I believe that LUNA, WILVER and MOLINA were the individuals who conducted the burglaries at VICTIM 5 and VICTIM 6's residences.

Burglary in Seven Hills, Ohio – October 17, 2025

76. On or around October 17, 2025, the Seven Hills Police Department was dispatched to a burglary at 2XX Maron Lane, Seven Hills, Ohio 44131. VICTIM 7[11] reported that when his/her family arrived home at approximately 9:30 p.m., they saw the first-floor rear sliding glass door had been broken. VICTIM 7 reported that the last person to leave the residence was at approximately 6:45 p.m. VICTIM 7 reported that he/she had video surveillance footage of two individuals breaking into the residence at approximately 8:37 p.m. VICTIM 7 reported that various jewelry items and handbags were taken, as well as approximately $9,800.00 in U.S. Currency.

77. JP Morgan Chase records revealed that on or about October 18, 2025, a total of approximately $9,280.00 was deposited via four ATM Deposits at 7923 Preston Highway, Louisville, Kentucky in the aforementioned JP Morgan Chase Accounts. Below is a breakdown of the deposits:

a. 600368891 – WILVER (Individual Checking)

    i. Total Deposit: $1,180.00 (one transaction)

[11] VICTIM 7's identity is known to law enforcement, but is not included in this affidavit to protect VICTIM 7's identity.

b. 763428300 – LUNA (Individual Checking)

   i. Total Deposit: $4,100.00 (one transaction)

c. 2905355236– JHON (Individual Checking)

   i. Total Deposit: $700.00 (one transaction)

d. 5036318576 – JHON (Individual Savings)

   i. Total Deposit: $3,300.00 (one transaction)

78. JP Morgan Chase records revealed that on or about October 14, 2025, an ATM deposit was made to WILVER's account 600368891 for $261.00 at an ATM located at 12388 Cedar Road, Cleveland Heights, Ohio.

79. I conducted a query of Google Maps between VICTIM 7's residence and 12388 Cedar Road, Cleveland Heights, Ohio, which revealed an approximate distance of 13 miles.

80. I believe that LUNA, WILVER and JHON were the individuals the conducted the burglary of VICTIM 7's residence.

<u>Burglary in Bryan, Ohio – November 5, 2025</u>

81. On or around November 5, 2025, the Bryan Police Department responded to a breaking-and-entering complaint at 1XXX South Lynn Street, Bryan, Ohio 43506. VICTIM 8[12] reported that he/she left for work at approximately 10:00 a.m. and was the last of the family members to leave the residence for the day. The Bryan Police Department believed the unknown individuals gained entry through a window in the southwest corner of the residence, due to the window being damaged and ajar. VICTIM 8 reported that a safe was stolen from the closet of the same room with the ajar window and the safe contained multiple valuables, personal papers, and approximately $16,000.00 in U.S. Currency.

---

[12] VICTIM 8's identity is known to law enforcement, but is not included in this affidavit to protect VICTIM 8's identity

82. The Bryan Police Department reviewed surveillance footage at a car wash located near VICTIM 8's residence, which revealed a red Mazda CX-90 driving past VICTIM 8's residence multiple times and an individual is observed exiting the vehicle and approaching VICTIM 8's residence. The vehicles license plate was not visible in the surveillance footage.

83. The Bryan Police Department reviewed Flock Safety database, which revealed a vehicle matching the vehicle from the surveillance footage from the car wash. The vehicle had Texas registration WPG6441. The Bryan Police Department obtained the registered owner of the Texas license plate WPG6441, which revealed the registered owner as LUNA with an address of 18307 Glen Shee Drive, Richmond, TX 77407.

84. JP Morgan Chase records revealed that on or about November 6, 2025 and November 7, 2025, a total of approximately $10,422.00 was deposited via five ATM Deposits in Fort Wayne, Indiana. Below is a breakdown of the deposits:

a. 600368891 – WILVER (Individual Checking)
    i. Total Deposit: $2,061.00 (one transaction)
b. 763428300 – LUNA (Individual Checking)
    i. Total Deposit: $4,710.00 (two transactions)
c. 2900482170 – LUNA (Individual Checking)
    i. Total Deposit: $3,651.00 (two transactions)

85. I queried Google Maps for the distance between VICTIM 8's residence and Fort Wayne, Indiana, which revealed a distance of approximately 50 miles.

86. I believe LUNA and WILVER were the individuals that conducted the burglary at VICTIM 8's residence.

<u>Burglary in Pella, Ohio – November 5, 2025</u>

87. On or around January 24, 2026, the Pella Police Department was dispatched to a burglary at 2XXX Indigo Lane, Pella, Iowa 50219. VICTIM 9[13] reported that the back sliding glass door had been smashed and the house had been ransacked and several items were missing, including approximately $3,400.00 in U.S. Currency and several pieces of jewelry with an approximate value of $2,857.00. VICTIM 9 and his/her family owned a local Asian restaurant.

88. The Pella Police Department reviewed video surveillance from multiple neighbors of VICTIM 9, which revealed a black or dark Dodge Durango in the area of VICTIM 9's residence. The vehicle turned onto VICTIM 9's street at approximately 7:36 p.m. At approximately 7:49 p.m., the dark Dodge Durango pulls up in front of VICTIM 9's residence and two individuals get out of the vehicle. At approximately 8:12 p.m., the vehicle leaves VICTIM 9's neighborhood traveling toward Washington Street. The Pella Police Department reviewed video surveillance footage from a gas station near VICTIM 9's residence, which revealed a vehicle matching the description of the black or dark Dodge Durango that was traveling east on Washington and turning onto highway 163 towards Des Moines at approximately 8:14 p.m.

89. The Pella Police Department received information from the Ozaukee County Sheriff's Office related to the aforementioned burglary in Beaver Dam, Wisconsin. The Ozaukee County Sheriff's Office obtained GPS locations from a search warrant to Enterprise for the vehicle rented by ANDRES, which revealed that the same vehicle utilized in the Beaver Dam, Wisconsin burglary was in the area at the time of the burglary of VICTIM 9's residence.

90. JP Morgan Chase records revealed that on or about January 26, 2026, a total of approximately $3,300.00 was deposited via three ATM Deposits at an ATM located at 3101 Ingersoll Avenue, Des Moines, Iowa. Below is a breakdown of the deposits:

[13] VICTIM 9's identity is known to law enforcement, but is not included in this affidavit to protect VICTIM 9's identity

a. 763428300 – LUNA (Individual Checking)

i. Total Deposit: $3,300.00 (three transactions)

91. Airbnb records revealed that LUNA rented an Airbnb located at 2XXX Logan Avenue, Des Moines, Iowa from January 20, 2026 to January 26, 2026.

92. I believe that LUNA and ANDRES were involved in the burglary of VICTIM 9's residence.

93. On or around April 3, 2026, Early Warning Service (Zelle) produced records for information related to LUNA. Below is a summary of the records produced:[14]

a. LUNA:

i. Customer ID: 224702874

1. Name: DOMINICK LUNA

2. Sender Token: lunascleaning57@gmail.com

ii. Customer ID: 40f484a3-5bd8-4662-a417-5c0dc0ccf8e9

1. Name: DOMINICK LUNA

2. Sender Token: lunascleaning57@gmail.com

iii. Customer ID: 59845799

1. Name: DOMINICK LUNA

2. Sender Token: lunascleaning57@gmail.com

94. On or around February 3, 2026, I conducted a query of a law enforcement financial databases for identifiers associated with LUNA, JHON, WILVER, and ANDRES. Below is a summary of financial transactions discovered for each subject:

a. LUNA:

---

[14] The summary of the records is not an exhaustive list of the records produced.

i. Number of Transactions Sent: 145 (2017-2025)

ii. Total Value of Transactions Sent: $115,425.26

1. Colombia: $97,213.30

2. Mexico: $13,711.96

3. United States: $4,500.00

b. JHON:

i. Number of Transactions Sent: 20 (2024-2025)

ii. Total Value of Transactions Sent: $16,846.58

1. Colombia: $16,846.58

c. WILVER:

i. Number of Transactions Sent: 86 (2022-2025)

ii. Total Value of Transactions Sent: $78,319.14

1. Colombia: $57,872.20

2. Mexico: $18,558.00

3. Spain: $755.94

4. Canada: $600.00

5. Chile: $533.00

d. ANDRES:

i. Number of Transactions Sent: 19 (2024-2025)

ii. Total Value of Transactions Sent: $25,606.72

1. Colombia: $25,606.72.

95. On or about February 23, 2026, Apple Inc. produced records for the subscriber information related accounts associated with LUNA and JHON. Below is a summary of the information provided:

a. DSID[15]: 21550778615

   i. Customer Name: Black Doll

   ii. Billing Name: Dominick Luna Jr.

   iii. Apple Logon ID: dnick93@icloud.com

   iv. Phone Number: 612-461-3461

   v. Address: 13918 Westheimer Road, Houston, TX 7077-5359

   vi. iCloud Information:

      1. Email: dnick93@icloud.com

      2. Account Type: Full iCloud (iCloud+)

      3. Advanced Data Protection[16]: No

      4. Name: Black Doll

      5. Account Status: Active

      6. Creation Date: 02/22/2024

      7. Phone Number:

         a. 612-461-3461

         b. 702-319-6065

[15] Apple Account Identifying Number (Person ID/DSID) corresponds to a unique numeric identifier for an Apple account).

[16] Per apple.com/legal/privacy/law-enforcement-guidelines-us.pdf, Advanced Data Protection for iCloud is a feature that uses end-to-end encryption to protect iCloud data with Apple's highest level of data security. For users who enable Advanced Data Protection for iCloud, limited iCloud data may be available.

c. 207-922-0800

b. DSID: 8435649798

i. Customer Name: Andres Melvis Hurtado

ii. Email: andresmelvis348@gmail.com

iii. Address:

1. 2700 Woodland Park Drive, Houston, TX 77082-2610

2. 2310 Crescent Park Drive, Houston, TX 77077-6751

3. 8605 91st Avenue, Woodhaven, NY 11421-2526

iv. Phone Number:

1. 347-940-3036

v. iCloud Information:

1. Email: andresmelvis348@gmail.com

2. Account Type: Full iCloud (iCloud+)

3. Advanced Data Protection: No

4. Name: Andres Melvin Hurtado

5. Account Status: Active

6. Creation Date: 08/19/2015

7. Phone Number:

a. 347-940-3036

8. Features Used:

a. iCloud Backup (iOS Devices)

b. Bookmarks

c. Calendars

d. iCloud Photos

e. Contacts

f. Find My Friends

g. iCloud Drive

h. iCloud Reminders

i. Mail

j. Mail Header

k. Messages in iCloud

l. Notes

m. Sign in with Apple

n. Voice Memo

96. On or about March 9, 2026, the Honorable Stephen C. Dries, United States Magistrate Judge of the Eastern District of Wisconsin, issued a warrant for records and information for the aforementioned Apple iCloud accounts under Case Number 26-M-317. I reviewed ANDRES' account (DSID: 8435649798), which revealed three unique photos, each containing handwritten addresses on a notebook style paper. In total, there were approximately 158 different addresses. All of the addresses were located throughout Wisconsin. Included in the addresses from the photos were the addresses of VICTIM 2 and VICTIM 4. I believe the photos from ANDRES's Apple iCloud account were addresses of residents that ANDRES, LUNA, WILVER and JHON used for potential home burglaries.

97. I reviewed the metadata for the three photos containing the addresses. All three photos were taken on or about December 1, 2024. The photos contained latitude and longitude coordinates of [29.690641, -95.568267], [29.690625, -95.568306] and [29.690644, -95.568298].

I conducted a Google Map search of the latitude and longitude coordinates, which revealed that all three photos were taken in the proximity of 10630 Beechnut Street, Houston, Texas 77072.

98. I reviewed LUNA's Apple iCloud account (DSID: 21550778615), which revealed that LUNA had Google Chrome, Waze and Google Maps as installed applications. I understand Google Maps and Waze to be a free mapping, location, and tracking services offered by Google. I understand Google Chrome to be an application for a web browser developed by Google.

99. LUNA's iCloud account revealed approximately 596 Waze Places with a created time between April 24, 2025 to January 26, 2026. The Waze Places included addresses in Florida, Iowa, Indiana, Michigan, Ohio, Pennsylvania and Texas. LUNA's iCloud account revealed approximately 256 Google Maps search queries, however, the queries were encrypted.

100. LUNA's iCloud account revealed various Google Searches. Included below are some of the Google Searches from LUNA's iCloud account, including the search date:

a. "allpeople.com" – 1/26/2026

b. "fastpeoplesearch" – 1/26/2026

c. "Indian business owner in ames iowa" – 1/22/2026

d. "enformiongo" – 1/22/2026

e. "robinson caicedo sinisterra arrested Houston" – 1/22/2026

f. "crime rate burglary in ames iowa" – 1/21/2026

g. "crime rate in ames iowa" – 1/21/2026

h. "yair hanany riascos arrest burglary" – 1/20/2026

i. "4 man arrest yesterday in a burglary richmond & wilcrest" – 1/20/2026

101. I understand “fastpeoplesearch”, “allpeople.com” and “enformiongo” to be public directory databases for people and business searches and verification. [17] I believe that LUNA was utilizing these websites and databases to conduct research on potential victims to target for burglaries.

102. Airbnb records revealed that LUNA rented an Airbnb in Des Moines, Iowa between January 20, 2026 and January 26, 2026. I believe that LUNA’s searches related to crime rate in Ames, Iowa and Indian business owners on January 21 and January 22, respectively, are an attempt to research Ames, Iowa for potential burglaries.

103. I believe that LUNA’s searches related to historical arrests demonstrate LUNA’s knowledge of other theft groups getting arrested throughout the United States.

104. On or around February 10, 2026, Google produced records related for information related to the email address lunascleaning57@gmail.com (“TARGET ACCOUNT”). Below is a summary of the records produced:

a. Subscriber Name: Xavier Luna

b. Created: 2021-06-03 18:19:12 Z

c. Last Updated: 2026-01-28 09:32:17 Z

d. Last Login: 2026-01-28 09:32:17 Z

e. Services: Gmail, Google Hangouts, Android, Google Calendar, Location History, YouTube, Google Payments, Play Loyalty, Google Chat, Google My Maps, Google Maps.

[17] https://www.enformion.com/about-us/, https://allpeople.com/, https://fastpeoplesearch.com/

105. 48. On February 10, 2026 and June 26, 2026, I submitted a Preservation Request to Google LLC to preserve the account related to TARGET ACCOUNT and information contained therein

106. Based on my training and experience in federal investigations involving transnational criminal organizations from Central and South America, the methods described above to evade law enforcement detection via rental vehicles, non-attributable cellphones, and interstate travel is consistent with actions taken by South American Theft Groups (SATGs). These groups are known to target homes likely to contain items of value such as jewelry, cash, and other items of value. Because these burglaries often target homes likely to contain items of significant value, burglaries committed by SATGs often require a significant amount of planning and coordination, including pre-execution surveillance, the use of technology, such as signal jammers, and burglar's tools. These subjects then need to transport or sell the stolen items and launder the proceeds of these stolen items often across both state and international borders. SATGs will often fence these stolen items through intermediaries, or melt down jewelry and precious metals, so that these stolen items cannot be traced, and then launder the money back to their home countries via wire transfers, cryptocurrency, and bulk cash. Often this requires communication and coordination with other targets and subjects, here and abroad, and documentation through photographs, text messages, emails, and financial transactions. They also require travel and rental documents, such as those described in the affidavit including flight records, airline tickets, rental property transactions, and vehicle rental transactions. As discussed above, LUNA, JHON, WILVER and ANDRES were in possession of the cellular devices at the time of their arrest and JANELLY was in possession of a cellular device while conducting various ATM transactions from LUNA's JP Morgan Chase Bank account. In addition, based on my training and experience in general and the

facts of this investigation in particular, I know that criminals frequently use mobile phones in furtherance of their criminal activity. Specifically, criminals use phones to contact associates and co-conspirators with their mobile phones. Such communications, moreover, may be by direct oral call, SMS or MMS, or by using a Web-based application such as WhatsApp, Telegram, Signal, or another encrypted messaging platform.

**BACKGROUND CONCERNING GOOGLE**

107. Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

108. In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

109. Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

110. Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

111. Google Plus, a social networking platform on which Google users can create a publicly visible profile that displays status updates posted by the user and certain other user-populated information, including a "tagline" describing the user, a profile photo, background photo, cover photo, and other details about the user, including the user's birthday, previous work and school history, interests, and places lived. Google Plus users are able to communicate with, "follow" the profiles and activities of, comment on posts made by, and share information posted by, other Google Plus users. A Google Plus user also can elect to display on his or her Google Plus profile links to (a) the user's other social networking profiles or accounts (including those that are non-Google-based), (b) websites for which the user is a contributing author, and (c) links to any other websites that are recommended by the use;

112. Google Hangouts ("Hangouts"), an instant messaging service which allows users to communicate by text, voice, and video. A Hangouts user can, among other things, participate in group conversations, share photos, maps, and other media with other users of Hangouts, and place calls to landline, mobile, and internet-based telephone numbers;

113. Google Photos ("Photos"), a digital photograph and video storage service where a user can upload photos and videos from any platform to servers controlled by Google, categorize these photos and videos into albums, and share them with other users;

114. Google Maps, a geolocation service through which users can find and share turn by-turn directions between two points, save locations, and search geographic areas, including their current vicinity. Users can share their real-time location with others through Maps by using the Location Sharing feature. Google retains a record of the use of this service whenever the user is logged into their account and has opted into location services and history settings. Google account holders can also create, save, and share personalized maps using Google My Maps;

115. Google Location Services and Location History, device settings by which users authorize Google to access and retain a record of their device's approximate location at regular intervals using GPS, WiFi, mobile networks, sensors, and other sources. This location data is then supplied to any apps (whether Google based or otherwise) operating on the devices that have been authorized by the user to access the user's location information;

116. Google Docs, Google Sheets, and Google Slides services provided by Google that offer users web-based alternatives to existing word processing, spreadsheet, and presentation software. Documents created using these platforms are stored in servers controlled by Google and accessible from any device using web browsers and mobile apps logged into the user's account. The creator of the document can enable access and editing to the document by any other user to allow for collaboration and communication in the document development. This information, based on my training and experience, can include pay-owe sheets, recordation of sales, as well as communications with unknown co-conspirators and or witnesses;

117. Google also provides cloud storage through Google Drive, which includes an initial fifteen gigabytes of free storage space and the ability for users to purchase additional space if needed. That storage space, located on servers controlled by Google, may contain data associated with the use of Drive-connected devices, including the services and applications described above.

Drive can be used to store device backups, which can contain a user's photos and videos, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voice-mail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data. Data stored on Google Drive can be accessed by the user from any device using mobile apps and web browsers logged into the user's account, allowing users to easily regain information if their device is lost, stolen, or damaged.

118. Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

119. When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

120. Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was

created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

121. Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

122. Google also collects and retains location data from mobile devices that have opted into the Location Services and Location History services. The company uses this information for location-based services, such as targeted advertising and Google Maps guidance. This information derives from a range of sources, including Global Positioning System (GPS) data, cell site/cell tower information, and Wi-Fi access points. User preferences may impact the extent and detail of the location information collected. Other information may be collected by Google that provides inferences about a user's location. For example, WiFi access points may have descriptive names or be associated with locations in publicly accessible geolocation databases. IP addresses may also be associated with locations through similar services. Advertising records may contain specific or inferred location information. Metadata associated with image and video files stored by Google on

behalf of a user may include information about where the images or videos were taken (EXIF data, for example). In my training and experience, this data can show the movement of the suspect's mobile device and assist investigators with establishing patterns of movement and identifying residences, work locations, potential drug stash houses, suppliers, customer addresses, and other areas of investigative interest.

123. In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

124. Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

125. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time, may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier

information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

126. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

127. Other information connected to the use of a Google account may lead to the discovery of additional evidence. For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

128. Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

129. Based on the forgoing, I request that the Court issue the proposed search warrant.

130. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Google. Because the warrant will be served on Google, who will then

compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with Google LLC account number 348579712231 and email address lunascleaning57@gmail.com ("TARGET ACCOUNT"), that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google. Google is required to disclose to the government for each account or identifier listed in Attachment A the following information from October 1, 2024 to January 30, 2026, unless otherwise indicated:

a. All business records and subscriber information, in any form kept, pertaining to the Account, including:

1. Names (including subscriber names, user names, and screen names);
2. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses, including alternate and recovery email addresses);
3. Telephone numbers, including SMS recovery and alternate sign-in numbers;
4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including log-in IP addresses;

5. Telephone or instrument numbers or other subscriber numbers or identities, including any temporarily assigned network address, SMS recovery numbers, Google Voice numbers, and alternate sign-in numbers

6. Length of service (including start date and creation IP) and types of service utilized;

7. Means and source of payment (including any credit card or bank account number); and

8. Change history.

9. All device information associated with the Account, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC) addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, and telephone numbers;

10. Passwords or other protective devices in place and associated with the Accounts, which would permit access to the content stored therein;

11. The types of applications and services utilized by the Account(s);

12. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Google;

13. For the period from October 1, 2024 to January 30, 2026, all contacts stored by the Account(s), including address books, phone numbers, e-mails, social network links, calendar data, and images;

14. For the period of October 1, 2024 to January 30, 2026, all location data whether derived from Global Positioning System (GPS) data, cell site/cell tower triangulation/trilateration, precision measurement information such

as timing advance or per call measurement data, Wi-Fi locations, IP addresses, search history, advertising data, or metadata of images and videos, including all data associated with the use of Location Services and Location History, and all Google Maps data (including data concerning All maps data associated with the account, including Google Maps and Google Trips, including: all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; My Maps data; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history), and SSIDs and MAC addresses for all WiFi access points that have been detected by or connected to devices associated with the account. Such data shall include the GPS coordinates and the dates and times of all location recordings;

15. For the time period of October 1, 2024 to January 30, 2026, all records concerning the deletion of location data associated with the Account (except for data deleted by Google in the normal course of business);

16. For the time period of October 1, 2024 to January 30, 2026, Google Map location saved and/or frequent locations, favorite and/or starred locations including, but not limited to, searches conducted using the Google Map and/or Maze services, locations and other data associated with the use of My Maps and Location Sharing, and the logs and metadata associated with all of the above;

17. For the period of October 1, 2024 to January 30, 2026, all incoming and outgoing phone calls, voice-mails, and all instant messages associated with the Account(s) including stored or preserved copies of instant messages (including SMS messages and MMS messages) sent to and from the Account(s) (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

18. For the period October 1, 2024 to January 30, 2026, all activity relating to chats, such as Google Hangouts, including, but not limited to: all communications, including audio, video, text message and/or chat communications, and all data associated therewith;

19. For the period October 1, 2024 to January 30, 2026, all information for the Google Plus profile associated with the Account(s), including all status updates, tag-lines, profile photos, background photos, cover photos and other information regarding the user of the profile, comments, items shared by or with the profile, links to videos, photographs, articles, and other items, contact or "circle" lists created by the profile, contact or "circle" lists or other groups and networks of which the profile is a member, profiles or other items "followed" by the user of the profile, Google Plus users that

"followed" the profile, and information about access and use of Google Plus;

20. For the period October 1, 2024 to January 30, 2026, all call detail records, connection records, SMS, MMS, voice-mail messages sent by or from the Google Voice associated with the account;

21. For the period October 1, 2024 to January 30, 2026, all Web activity, including records of Internet browsing history from mobile searches, desktop browser searches, and searches from the Google accounts;

22. For the period October 1, 2024 to January 30, 2026, recent application usage associated with the Account(s) or its users (such as information collected through tracking cookies)

23. For the period October 1, 2024 to January 30, 2026, all activity relating to Google Photos, including, but not limited to: all images, graphic files, video files, and other media files stored in the Account(s), and/or were uploaded to or downloaded from any other Google service, and all data associated therewith, including the metadata for each file; and

24. For the period October 1, 2024 to January 30, 2026, all records pertaining to communications between Google and any person regarding the Account(s), including contacts with support services and records of actions taken.

Google is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## I. Information to be seized by the government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 18 U.S.C. § 1956(a)(1)(B) (concealment money laundering), 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity), 18 U.S.C. § 1956(h) (money laundering conspiracy), 18 U.S.C. §§ 371 (conspiracy to violate the laws of the United States), 2314 (interstate transportation of stolen goods), and 2315 (sale or receipt of stolen goods, securities, or moneys) ("TARGET OFFENSES") as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

a. Information that constitutes evidence of the identification or location of the user(s) of the Account;

b. Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

c. Information that constitutes evidence indicating the Account user's state of mind, e.g., intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

d. Evidence indicating how and when the account was used to determine the chronological context of account use, account access, and events relating to the crime under investigation;

e. Evidence indicating the geographic location of devices accessing the account at times relevant to the investigation;

f. Nature, types, amounts, value, and prices of goods, wares, merchandise, money, and other valuable items stolen;

g. Lists of locations targeted for burglaries, and lists of items sold, resold, transmitted, or converted;

h. Records and information about the transportation, transmission, transfer, or movement in interstate or foreign commerce of goods, wares, merchandise, money, and other valuable items stolen, including the victims, entities, physical addresses;

i. Records (including communications) and tangible objects relating to the existence, scope, objects, membership, and overt acts taken in furtherance of a conspiracy, including but not limited to the identities, entities, physical addresses, vehicles, travel, movement, location, and telephone numbers of the following:

    a. DOMINICK LUNA

    b. JHON ANDERSON GONZALEZ CAICEDO

    c. WILVER MANYOMA MEJIA

    d. ANDRES MAURICIO MELVIS HURTADO

    e. JANELLY XIMENA ANGULO PEREA.

j. Any information related to the source of funds used to rent, purchase, or use flights, rental cars, lodging, or other means of transportation.

k. Any information related to the resale, conversion, or disposition of goods, wares, merchandise, money, and other valuable items stolen.

l. Any information about the communication or coordination of co-conspirators, including but not limited to LUNA, JHON, WILVER, ANDRES, and JANELLY, including the schedule, location, or travel of the co-conspirators, including by flight and rental vehicle.

m. All bank records, checks, credit card bills, account information, cryptocurrency accounts, cryptocurrency wallets, cryptocurrency transactions, and other financial records.

n. Any information about encrypted communication applications, including FaceTime, Telegram, Signal, and WhatsApp between and amongst subjects, witnesses, and co-conspirators.

o. Any information relating to the ports of entry, admission to the United States, false statements in registration applications and travel visas, failure to notify authorities of a change of address while on a visa, or counterfeiting of any travel document or identification document.

p. Records and information pertaining to the payment, receipt, sale, transfer, or storage of money or other things of value by LUNA, JHON, WILVER, ANDRES, JANELLY, or any known or unknown co-conspirators, that relate to or include monies derived from burglaries including:

    a. Bank, credit union, investment, money transfer, and other financial accounts including cryptocurrency accounts or wallets.

    b. Credit and debit card accounts.

    c. Cryptocurrency accounts or “wallets.”

    d. Tax statements and returns.

e. Business or personal expenses.

f. Income, whether from wages or investments; and

g. Loans.

q. Records and tangible objects pertaining to the residence and travel or whereabouts of LUNA, JHON, WILVER, ANDRES, and JANELLY and any other identified co-conspirators during the time period between October 1, 2024 and January 28, 2026.

r. Records and tangible objects pertaining to the source, receipt, sale, or transfer of any burglarious tools including, but not limited to window punches, lock pick kits, wi-fi jamming kits and antennas, backpacks, masks, gloves, cellular devices.

s. Records and tangible objects pertaining to the obtainment, receipt, sale, negotiation, or transfer of any fraudulent identifying documents including the purchase, sale, transfer, obtainment of any identification cards, debit cards, passports, drivers' licenses, and/or residential or storage rental agreements, bank accounts, car rental agreements and airline flights.

t. Records and tangible objects relating to the ownership, occupancy, or use of the addresses listed above such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers.

u. Communications related to schemes to defraud and communications related to the payment/transfer/deposit/withdrawal/conversion/storage/transportation of monetary instruments (currency, traveler's checks in any form, all negotiable instruments, incomplete instruments, securities or stock in bearer form or otherwise, digital currency (virtual currency, crypto currency), goods, wares,

merchandise, money, and other valuable items stolen, including e-mails, videos, photographs, instant messages, chat logs, correspondence attached to e-mails (or drafts), calendar entries, contact lists, and text messages.

v. Communications regarding schedules and travel, activity conducted, or preparatory steps taken in furtherance of the scheme under investigation.

w. All financial records, bills, and account information, including evidence indicating the transfer or control of any proceeds of the scheme under investigation.

x. All records or information related to schemes to defraud and the receipt and disposition of proceeds of such schemes

y. Records and information related to any premises where any co-conspirators have resided or visited (temporary, permanent, or otherwise).

z. Evidence of user attribution showing who used or owned the account at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

aa. Evidence indicating the account user's state of mind as it relates to the crimes under investigation.

bb. The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s).

cc. The identity of the person(s) who communicated with the account about matters relating to the TARGET OFFENSES, including records that help reveal their whereabouts.

dd. Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.